IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1600 PENN CORP.,     :
   Plaintiff,     :   CIVIL ACTION
           :
   v.        :
           :
COMPUTER SCIENCES CORPORATION, :
   Defendant.    :   NO. 06-CV-5329
           :

MEMORANDUM

LEGROME D. DAVIS, J.         September 30, 2008

   Presently before this Court are Defendant's Motion for Summary Judgment (Doc. Nos. 49, 50) and Plaintiff's Response thereto (Doc. No. 52), as well as Plaintiff's Motion for Summary Judgment (Doc. No. 51) and Defendant's response thereto (Doc. Nos. 53, 54).  For the reasons set forth below, Defendant's Motion for Summary Judgment (Doc. Nos. 49, 50) is GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion for Summary Judgment (Doc. No. 51) is GRANTED IN PART and DENIED IN PART.

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

   The parties have provided a detailed, largely disputed account of the deterioration of their relationship.  We will only briefly recite the material and undisputed facts as the parties have presented them.  Plaintiff 1600 Penn Corp. ("1600 Penn") leased space to Computer Sciences Corporation ("CSC") in a building referred to as "the York Building."  A series of documents governed the relationship between the parties.  The documents at issue in this case include the

1

1994 Lease Agreement ("the Lease," attached as Exhibit A to Pl.'s Motion) and the 2005 Lease

Agreement Addendum III ("Addendum III," attached as Exhibit E to Pl.'s Motion).  CSC

planned to use the space rented in the York Building to service a contract with the United States

Department of Health and Human Services ("DHHS"), Health Care Finance Administration

("HCFA").  The parties often refer to CSC's contract with DHHS/HCFA as the "CDAC

Contract."

 The medical records processed under the CDAC Contract were stored in an area of the

York Building that the parties refer to as "the Record Storage Area" (or "Records Storage Area").

The Record Storage Area contained a structure referred to as the "Record Storage System" that

consisted of a wood sub-floor, a series of carriage and rails, and a series of shelves.  The actual

medical records were housed on the shelves within the Record Storage System.

 In or around January 2006, CSC learned that DHHS did not intend to exercise its option

to extend the CDAC contract.  CSC's CDAC Contract was not renewed by DHHS because the

government made a determination that it was going to award the CDAC Contract work to entities

qualifying under Section 8(a) as small businesses, and CSC did not satisfy that classification.

CSC attempted but failed to work with Buccaneer Data Services to formulate a response to the

Request for Proposals that would be issued by DHHS for the CDAC Contract work.  At the

recommendation of DHHS, CSC entered into a relationship with 2020 Company, LLC, which

was planning to submit a response to a Request for Proposals.  In late August 2006, CSC learned

that the CSC/2020 bid had not been chosen by DHHS to provide the CDAC services.  DHHS

awarded the CDAC Contract work to Buccaneer Data Services.  In September 2006, CSC

verbally advised 1600 Penn that the CSC/2020 bid had not been chosen.  At or around this time,

1600 Penn contacted CSC regarding a "win-win situation," and 1600 Penn asserts that a discussion occurred at this time regarding a potential assignment or sublet to Buccaneer Data Services.  CSC did not assign or sublet the leased premises.

Around this time, and continuing over the next few months, the relationship between the parties deteriorated. In a letter dated November 6, 2006, 1600 Penn informed CSC that CSC's failure to use the York Building for the only permitted use under the Lease would constitute an immediate default.  (Exhibit I to Pl.'s Motion.)  The letter stated that "leaving the Leased Premises vacant or the ceasing of business operations, are not uses of the Leased Premises that are acceptable to the Lessor."  (Id.)  In a November 16, 2006 letter, CSC informed 1600 Penn that CSC was "exercis[ing] its option to terminate the Lease, effective August 31, 2008," and CSC attached evidence that CSC's CDAC Contract had not been renewed.  (Exhibit J to Pl.'s Motion.)  On the same day, 1600 Penn responded that it would not accept CSC's termination of the Lease because 1600 Penn could not determine if CSC had grounds upon which it could properly terminate the Lease.  (Exhibit K to Pl.'s Motion.)

In its November 16, 2006 response, 1600 Penn also communicated concerns that the Record Storage System was being dismantled by CSC.  (Id.)  1600 Penn informed CSC that 1600 Penn considered the Record Storage System the property of 1600 Penn.  (Id.)  CSC responded in an email the next day and claimed that the Record Storage System was the property of the United States Government.  (Exhibit L to Pl.'s Motion.)  In November or December 2006, CSC removed the Record Storage System's shelves from the premises, and the evidence suggests that CSC removed the shelves for use in the "new contractor's building."  (Exhibit VV to Pl.'s Opposition.)

Another dispute broke out between the parties in December 2006.  In a letter dated December 6, 2006, 1600 Penn informed CSC that 1600 Penn was implementing new rules and regulations.  (Exhibit O to Pl.'s Motion.)  The rules required that CSC provide 1600 Penn with the following: (a) a site management plan, "including safety and security measures that are being implemented;" (b) two sets of keys to all facilities; (c) alarm access codes, along with the telephone numbers of the security firms who provided CSC's security alarms, as well as "[l]essee account codes;" (d) alarm monitoring procedures and notification lists; (e) HVAC operational plans, including monitoring and temperature settings (heating temperatures were requested to be set at a minimum of 55 degrees Fahrenheit); (f) identification of the CSC parties responsible for daily management and oversight of the York Building, as well as the "representatives' locations and 24-hour access telephone numbers."  (Id.)  CSC did not comply with these requests and took the position that the requests were beyond 1600's authority.

In January 2007, 1600 Penn authorized another tenant of the York Building to change the locks.  The other tenant was Harrisburg Area Community College ("HACC").  1600 Penn claims that it changed the locks to provide itself access to the building due to concerns with security and maintenance that developed after CSC vacated the premises.  On the day it changed the locks, 1600 Penn gave new keys to a CSC employee named Valerie Wolfe.  Valerie Wolfe was responsible for maintaining the keys to the York Building and checking the York Building on a periodic basis.  HACC requested a copy of the new keys from Valerie Wolfe, and when she denied the request, 1600 Penn provided HACC with keys.  In a letter dated February 12, 2007, CSC notified 1600 Penn that 1600 Penn materially breached the Lease by changing the locks and allowing HACC access to the leased premises.  (Exhibit V to Pl.'s Motion.)  And in a letter dated

March 7, 2007, CSC informed 1600 Penn that due to 1600 Penn's default, CSC was "excused from performing further under the Lease." (Exhibit X to Pl.'s Motion.) CSC also purported to tender possession of the leased premises back to 1600 Penn. (Id.) 1600 Penn responded that CSC "has no right under the Lease, at law or in equity to 'tender possession' of the premises" to 1600 Penn. (Exhibit Y to Pl.'s Motion.) By letter dated April 5, 2007, CSC notified 1600 Penn that CSC was creating an interest-bearing escrow account into which it would deposit its payments of "monthly rent and fees until this litigation is resolved," and 1600 Penn responded that "this proposal is not acceptable." (Exhibit AA to Pl.'s Motion.) There followed a series of notices of default from 1600 Penn regarding missed installments of annual and additional rent.

The current litigation began in December 2006. On December 5, 2006, 1600 Penn filed a Verified Complaint in Confession of Judgment against CSC. Although judgment was entered in favor of 1600 Penn on December 21, 2006, CSC filed a Motion to Strike or Open Judgment on January 2, 2007, arguing that the amount of the judgment was inaccurate. This Court vacated 1600 Penn's Judgment by Confession on February 6, 2007. Plaintiff's Third Amended Complaint was filed on November 1, 2007.

In its Third Amended Complaint, 1600 Penn sets forth ten counts against CSC. The claims are predominantly contract claims but also include one tort claim and a request for declaratory judgment. CSC has requested summary judgment in its favor on all ten counts, as well as on its counterclaim for declaratory judgment. In addition to contesting CSC's motion, 1600 Penn has filed a cross-motion requesting summary judgment in its favor on nine of the counts listed in the Third Amended Complaint.

## II.     LEGAL STANDARD

In considering a motion for summary judgment, the court must determine whether "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable inferences from the record are drawn in favor of the non-movant. See Anderson, 477 U.S. at 255; J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991).  In ruling on the motion, the court "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255.  "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987).

## III.   DISCUSSION

Under Pennsylvania law, "a lease is a contract." Abdulhay v. Bethlehem Medical Arts, L.P., 425 F. Supp. 2d 646, 659 (E.D. Pa. 2006) (citing Mace v. Atlantic Refining & Marketing Corp., 785 A.2d 491, 496 (Pa. 2001)).  Thus, a lease is "to be interpreted according to contract principles." Mace, 785 A.2d at 496.  To prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'" Jefferies v. Ameriquest Mortgage Co., 543 F. Supp. 2d 368, 387 (E.D. Pa. 2008) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)).  In Pennsylvania,

6

contract interpretation "is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." In re Old Summit Mfg., 523 F.3d 134, 137 (3d Cir. 2008) (citing Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Cmwlth. 2005)).

Count I - Breach of Contract<br>CSC's Dismantling and Removal of the Record Storage Systems

This Court cannot grant either party's summary judgment motion regarding Count I of the Third Amended Complaint.  In Count I, 1600 Penn claims that CSC breached the Lease by removing the shelves from the Record Storage System.  According to the parties, the Lease includes two provisions that pertain to this issue.  First, Article 5.3 of the Lease provides that "[t]itle to the Leased Premises, and any other buildings, structures and improvements constructed or affixed upon the Leased Premises . . . shall vest in and be the property of Lessor immediately upon the termination of this Lease, whether by expiration, the terms and conditions contained herein, operation of law, or otherwise."  Second, Article 14.1 of the Lease provides that "[a]ll . . . alterations, additions, installations and improvements shall be deemed Lessor's property and trade fixtures and shall, at the option of Lessor, remain the property of Lessor, provided that they are not deemed by Lessor to be non-permanent and removable in nature."

The parties disagree as to whether the Record Storage System was 1600 Penn's property as either an "improvement[] constructed or affixed upon the Leased Premises" under Article 5.3 of the Lease or an "alteration[], addition[], installation[] or improvement[] to or upon the Leased Premises" under Article 14.1.  While the Lease does not define any of these terms, "[w]hen a writing is clear and unequivocal, its meaning must be determined by its contents alone."  In re

7

Old Summit Mfg., LLC, 523 F.3d at 137 (citing Pa. Indus. for the Blind & Handicapped, 886 A.2d at 711).   "When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning."  Profit Wize Mktg v. Wiest, 812 A.2d 1270, 1274 (Pa. Super. 2002).  Pennsylvania law counsels that "words of doubtful meaning" in contractual provisions governing trade fixtures "are to be construed in favor of the tenant." See Parkway Auto Serv. v. Wright, 49 Pa. D. & C. 556, 563 (Pa. Com. Pl. 1943) (finding intent that building was to remain property of lessor upon termination of lease); see also In re Mount Holly Paper Co., 110 F.2d 220, 225 (3d Cir. 1940) (finding no clear intent that "machinery placed on the leased premises was to become the property of the lessors").  In the present case, the definitions proposed by CSC seem to support a finding that the Record Storage System, including its shelves, were within the grasp of Sections 5.3 and 14.1.  (See Def.'s Mot. at 6-7 (defining an "improvement" as a "permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs");  Def.'s Mot. at 7 (defining "alteration" as "[a]ny construction or renovation to an existing structure other than repair or addition"); Def.'s Mot. at 7 (defining "addition" as a "part added (as to a building or residential section)").)  However, neither party has developed facts in the record that would warrant judgment as a matter of law in its favor.

We have been presented limited undisputed facts describing the Record Storage System, and the undisputed facts are not so one-sided that a reasonable factfinder could only find for one party.  1600 Penn provided this Court with photographs of the System.  (Exhibits OO, PP to Pl.'s Motion.)  However, the photographs tell us nothing more than what we have been directly told by

both parties—that the System consists of a series of shelves, a wood floor, and a series of carriage and rails. We have been told virtually nothing about how the System was assembled and how it was removed from the York Building.[1] We have no understanding of how the System operates. We do not know what 1600 Penn's intent was with regard to the System when the System was assembled, although we have seen deposition testimony in which 1600 Penn's president testified that he did not have an understanding of who owned the units. Without more information, we cannot determine if the System is covered by Sections 5.3 and/or 14.1. We do know that CSC paid $122,181.00 in 2005 to move the Record Storage System to accommodate the relocation of another tenant in the York Building. Also, the parties have produced an email demonstrating that the shelves were relocated to the Buccaneer Data Services' facility rather than to another CSC facility. While it seems likely that the System falls within the ambit of Sections 5.3 and/or 14.1, 1600 Penn has not produced evidence that would warrant judgment in its favor. Further, making all inferences in favor of 1600 Penn, we cannot grant CSC's motion.

Without citing any legal authority, CSC contends that the Record Storage System could not have become the property of 1600 Penn because the Record Storage System is the property of the United States Government. "'As a general rule, parties, as between themselves, may, in their dealings with chattels annexed to, or used in connection with, real estate, fix on them whatever character, as realty or personalty, *on which they may agree* . . . , and the law will enforce such understanding *whenever the rights of third parties will not be prejudiced*.'" Royal Store Fixture Co. v. Patten, 130 A.2d 271, 274 (Pa. Super. 1957) (quoting Brandt v. Koppelman, 82 A.2d 666,

---

[1]While 1600 Penn insists that it has provided emails demonstrating that CSC contemplated liability for removing the shelves, the emails only demonstrate that CSC contemplated potential liability for damage done to the premises during removal.

667 (Pa. Super. 1951)) (second emphasis added).  However, this rule of law only works against a lessor where the lessor has knowledge of the third party's ownership of the chattel, as can be proven through reference to a lessor's waiver.  Id. at 274-75.  While decisions in at least one other jurisdiction seem to state the rule more broadly, see, e.g., EAC Credit Corp. v. Bass, 21 Cal. App. 3d 645, 651-54 (1971) (examining case law and holding that "a lessor gains no interest in fixtures which are installed by the lessee but owned by a third party"), these decisions involve conditional sellers enforcing their rights directly against landlords, and the decisions are based on the theory that because "the lessor must stand in the shoes of the lessee, he cannot prevail against the conditional vendor unless the lessee could have done so," id. at 653.  Even those decisions agree that the lessor may have a remedy against the tenant.  Id. at 652.

In the present case, even assuming the United States Government rather than CSC had title to the Record Storage System,[2] CSC has produced no evidence that 1600 Penn had knowledge of the Government's ownership at the time the Record Storage System was annexed to the York Building.  Nor has CSC produced evidence of a contract between the Government and CSC and/or 1600 Penn by which the Government sought to preserve its ownership of the Record Storage System despite its annexation to the York Building.  Finally, CSC cannot escape liability for any damage done to the York Building upon removal of the shelves by claiming that the shelves were the property of a third party.

Finally, CSC argues that 1600 Penn's claim fails because there is no evidence from which

---

[2]This assumption is by no means an acceptance of this factual contention.  In the light most favorable to CSC, there is a genuine issue of material fact with regard to the ownership of the Record Storage System at the time it was annexed to the York Building.  CSC cites in support nothing more than the deposition testimony of CSC employees and a DHHS form referring to "shelving units."

1600 Penn's damages may be calculated to a "reasonable certainty." It is true that, under Pennsylvania law, "a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225-26 (3d Cir. 2003) (citing ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 668 (3d Cir. 1998)). Here, 1600 Penn has demanded monetary damages in excess of $119,200.00 for this claim. In support of its demand for monetary damages, 1600 Penn cites a price quote to reinstall the Record Storage System at a cost of approximately $119,200.00. The price quote appears to have been generated by National Office Systems. The price quote describes the work to be performed as follows: "4 Post Shelving System to be installed on existing Aisle Saver System carriages in the same configuration as was installed in September of 2005 to include product freight, installation and trash removal." (Exhibit to QQ Pl.'s Motion.) Making all inference in favor of 1600 Penn, 1600 Penn has produced sufficient evidence of damages to defeat CSC's motion for summary judgment.

CSC argues that the price quote is hearsay and therefore cannot be considered for purposes of summary judgment. The "United States Supreme Court [has] rejected the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). "[H]earsay evidence . . . may be considered if the out-of-court declarant could later present the evidence through direct testimony." Id. The parties have not indicated that a representative of National Office Systems would not be able to testify at trial. Thus, there is no reason why the price quotation cannot be considered to defeat summary judgment.

11

Count II - Breach of Contract
CSC's Breach of the Lease's Specific Use Requirement

_____We grant CSC's motion for summary judgment regarding Count II of the Third Amended Complaint.  1600 Penn alleges that CSC breached the parties' Lease and its addenda by violating Section 7.5 of the Lease and/or Paragraph 6 of Addendum III.  (See Lease Agreement § 7.5 ("[T]he Leased Premises . . . shall be used by Lessee for the purpose of providing a facility for the provision of clinical data abstraction services of medical records to the Peer Review Organizations supported by Lessee's operations pursuant to its Contract Number 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 with the HCFA."); Addendum III ¶ 6 ("[T]he Lessee shall use the Leased Premises only for the purpose of performing Lessee's obligations under the CDAC Contract, and all other uses specifically related to the CDAC Contract, and for no other purpose(s).").)  It is undisputed that CSC verbally notified 1600 Penn in September 2006 that the CSC/2020 bid had not been accepted.  According to 1600 Penn, CSC breached the Specific Use provisions when CSC thereafter declined to assign or sublet the York Building and instead vacated the premises.

CSC raises the rule set forth in Dickey v. Philadelphia Minit-Man Corporation that under Pennsylvania law "a provision in a lease that the premises are to be used only for a certain, prescribed purpose imports no obligation on the part of the lessee to use or continue to use the premises for that purpose; such a provision is a covenant against a noncomplying use, not a covenant to use."  105 A.2d 580, 581 (Pa. 1954).  CSC's contention is accurate.  1600 Penn cannot claim that CSC violated the express Specific Use provisions stated in the lease agreements.

However, 1600 Penn attempts to reinvigorate its claim by relying on an "implied

obligation to occupy" the York Building.[3]  The <u>Dickey</u> decision also discussed implied

obligations to occupy.  Plaintiff's contention has surface appeal.  While the Pennsylvania

Supreme Court in <u>Dickey</u> found no implied obligation to occupy in the lease at issue in that case,

the <u>Dickey</u> decision "did not address the situation where a plaintiff alleges that the defendant

acted in bad faith or lacked sound business judgment for its decision." <u>P.V.C. Realty ex rel.</u>

<u>Zamias v. Weis Markets</u>, 56 Pa. D. & C 4th 304, 310-11 (Pa. Com. Pl. 2000); <u>Slater v. Pearle</u>

<u>Vision Center, Inc.</u>, 546 A.2d 676, 678 (Pa. Super. 1988).  In addition, the Pennsylvania Superior

Court has held that "<u>Dickey</u> specifically does not address a situation where the tenant conducts

no business on the leased premises." <u>Slater</u>, 546 A.2d at 678.  Here, 1600 Penn alleges that CSC

decided to vacate the leased premises for no other reason than to harm 1600 Penn and Buccaneer.

There is no dispute that CSC vacated the York Building, and as discussed below, there is a

genuine issue with regard to whether CSC made the decision to vacate in good faith.

However, an inquiry into whether an implied obligation to occupy has been imposed on a

lessee includes "consideration of all the circumstances of [the] case, including consideration of

all the provisions of the lease." <u>Slater</u>, 546 A.2d at 679.  The obligation must be "clearly

implied" in the lease. <u>Rivera v. La Crosse</u>, 490 F.2d 1380, 1381 (3d Cir. 1974).  1600 Penn itself

observes that it must point to provisions in the Lease "other than the use clause from which an

obligation to use and occupy might be implied." <u>Id.</u> (finding an implied obligation to use in part

based on the doctrine of necessary implication); (Pl.'s Motion at 9).  Here, 1600 Penn has failed

_____

[3]It is by no means clear that 1600 Penn pleaded its implied obligation claim.  <u>See</u> <u>Jefferies</u>
<u>v. Ameriquest Mortgage Co.</u>, 543 F. Supp. 2d 368, 387 (E.D. Pa. 2008) (A plaintiff "cannot raise
a new claim in her brief that she has not already pleaded.").  However, we will rule on the claim
nonetheless.

to raise any provision from which a duty to occupy might be implied.

In addition, the factual circumstances that have demanded a finding of an implied obligation in other cases are not present in this case.  See, e.g., Rivera, 490 F.2d at 1380-81 (based in part on the fact that the lease included a provision that calculated rent based on the percentage of lessee's use-specific income); Slater, 546 A.2d at 678 (based in part on the fact that leased premises were "part of a strip of stores where the economic health of each store may be dependent on the others").  We therefore find as a matter of law that no covenant to occupy can be implied in the Lease, and we grant summary judgment in favor of CSC.[4]

Count III - Breach of Contract
CSC's Failure to Provide Lessor Access to the Leased Premises

We grant CSC's motion for summary judgment with regard to Count III.  In Count III of the Amended Complaint, 1600 Penn claims that CSC breached the Lease by failing to provide access to the leased premises.  Addendum III Paragraph 7 and Section 21.2 of the Lease govern 1600 Penn's access to the leased premises.  Section 21.2 of the Lease provides in relevant part that "[u]pon one (1) hour advance written or oral notice . . . to the Lessee, . . . [Lessor] shall have the right to access and enter the Leased Premises to inspect, repair, or maintain the Leased Premises and/or the Building, and any vending machines operated by Lessor."  Paragraph 7 of Addendum III provides in relevant part that "[a]ccess shall be granted to Lessor . . . in order to maintain, repair, adjust, modify or work on any building Systems, Components, Equipment,

---

[4]Because summary judgment is granted on this ground, we will not address CSC's contention that the "doctrines of impossibility/impracticability/frustration of purpose" operate to relieve CSC from any liability under Count II.  However, because CSC raises the same doctrines to defend against "all the Counts of the Third Amended Complaint which arise from actions supposedly taken (or not taken) after December 14, 2006," (Def.'s Motion at 12 n.12), and Counts XIII and IX in particular, we will address this contention below.

Structure or any other Building related items that are contained within the Premises, including

electrical, mechanical, sprinkler, plumbing and HVAC systems."  Paragraph 7 of Addendum III

continues, "Such access shall be granted to the Lessor . . . upon an appointment being requested

twenty four (24) hours in advance of the required entry."[5]

_____While it seems that this claim is really a claim for breach of new rules and regulations,

both CSC and 1600 Penn seem to agree that 1600 Penn demanded access to the York Building

on at least two occasions.  On December 6, 2006, 1600 Penn requested a list of items including

two sets of keys to all facilities on the Premises and alarm access codes.  (Exhibit O to Pl.'s

Motion.)  And on December 7, 2006, 1600 Penn explained its request for the items listed in the

December 6 letter:

> In light of CSC's imminent non-occupancy and oversight of the
> Premises on an ongoing daily basis, it is reasonable for the Lessor
> to have the ability to periodically access the Premises in order to be
> assured that the responsibilities and obligations of the Lessee are
> being fulfilled, including the Lessor's rights to have the
> opportunity to determine if the Lessor's property and building are
> being adequately safeguarded and protected.

(Exhibit Q to Pl.'s Motion.)  CSC concedes that it did not comply with these demands.

Because the facts material to Count III are not disputed, we are left with a question of

contract interpretation.  It is undisputed that 1600 Penn demanded keys to the York Building, as

---

[5]CSC argues that only Paragraph 7 of Addendum III applies.  However, Paragraph 10 of
Addendum III states that "[e]xcept as modified by this Addendum III, the Lease and its
Addendums are hereby ratified and confirmed and all terms in the Lease remain in full force and
effect."  The provisions of Addendum III that are intended to replace provisions in the original
Lease specifically so state.  (See, e.g., Addendum III ¶ 2 ("Section 2.3 of the Lease is hereby
deleted in its entirety . . . ."); Addendum III ¶ 3 ("Section 2.4 of the Lease is hereby amended in
its entirety as follows . . . .").)  Therefore both Paragraph 7 of Addendum III and Section 21.2 of
the Lease operate to govern 1600 Penn's right of access to the York Building.

well as alarm access codes, so that it could "periodically access" the York Building.  However,

1600 Penn's access rights, as well as the procedures for access, are clearly listed in Addendum III

Paragraph 7 as well as Section 21.2 of the Lease.  While the purposes for which 1600 Penn

demanded access may have fit within 1600 Penn's right to access the leased premises to inspect

or maintain, no provision grants 1600 Penn the right to have the alarm codes and its own keys so

that it could "periodically access" the leased premises.  We grant CSC's motion for summary

judgment on Count III of the Third Amended Complaint.

Count IV - Breach of Contract
CSC's Failure to Adequately Maintain the Leased Premises

We do not grant either parties' motion with regard to Count IV.  1600 Penn alleges in

Count IV that CSC breached Section 10.2 of the Lease by failing to adequately maintain the

leased premises.  Section 10.2 of the Lease provides in relevant part that "Lessee shall, at its sole

cost and expense, keep and maintain in a clean and safe condition, and make all necessary repairs

to the Leased Premises . . . ."  Section 10.2 includes a nonexclusive list of duties including

maintenance of the following: (a) the plumbing, heating, ventilating, air conditioning, electrical

and sewage systems servicing the leased premises; (b) the telephone and computer systems

servicing the leased premises; (c) the interior of the leased premises, including janitorial,

cleaning, and security services for the leased premises; and (d) the removal of trash and debris

from the leased premises.  1600 Penn claims that CSC materially breached Section 10.2 by

"failing to adequately maintain the Leased Premises when it canceled its ADT security service

and discontinued all other services and maintenance activities for the Leased Premises."  First,

we find as a matter of law that Section 10.2 itemizes CSC's obligations as a tenant and the

16

services CSC was expected to put in place as a tenant in the building.  Thus, the question becomes an inquiry into whether CSC defaulted on its duties and obligations.

CSC makes a two-part response with a line drawn at March 4, 2007.  March 4, 2007 serves as a demarcation line for CSC because, according to CSC, "by letter dated March 4, 2007, CSC tendered possession of the premises back to 1600 Penn."  (Def.'s Motion at 13-16; Def.'s Opposition at 15-16.)  In regard to any alleged breach prior to March 4, 2007, CSC claims that 1600 Penn has put forth an inaccurate statement of the pertinent facts, and that under an accurate statement of the facts, CSC is entitled to summary judgment.  In regard to any alleged breach after March 4, 2007, CSC claims that it cannot be held liable because it was no longer in possession of the York Building and therefore is entitled to summary judgment.  In deciding the present motions, we do not have to adhere to CSC's demarcation line.  Summary judgment cannot be granted for either party based on the facts before March 4, 2007 or after March 4, 2007.

First, the parties vigorously dispute the adequacy of the measures taken by CSC to "keep and maintain [the leased premises] in a clean and safe condition" as required by Section 10.2 of the Lease.  The parties appear to agree that Valerie Wolfe, an employee of CSC, visited the York Building.  However, as discussed below with regard to Count V, the parties dispute how often Valerie Wolfe visited the premises and what actions she took when she visited.  In addition, 1600 Penn provided testimony that, after CSC left the building, people "meandered around" the York building looking for CSC.[6]  (Exhibit A to Def.'s Motion.)  Finally, in its argument that it cannot

---

[6]CSC raises the argument that this testimony is hearsay because the deponent received the information from another tenant of the York Building.  There is no reason to believe that the other tenant will not be available to testify at trial, and the hearsay objection cannot therefore

be liable for any breach or default after March 4, 2007, CSC summarily asserts several defenses[7] that the Court cannot accept without impermissibly weighing the evidence put forth by the parties.  This Court cannot rule on the sufficiency of CSC's conduct, or its defenses, at this stage based on the state of the record.  Because we cannot determine whether the contract was breached, we cannot address the materiality of any breach.[8]  Therefore, we do not grant either party's motion with regard to Count IV.

Count V - Breach of Contract<br>CSC's Breach of Rules and Regulations under the Lease Agreement

We will not grant either party's motion with regard to Count V.  In Count V of the Amended Complaint, 1600 Penn alleges that CSC materially breached the rules and regulations implemented by 1600 Penn in accordance with the Lease Agreement.  CSC counters by claiming that the rules and regulations implemented by 1600 Penn were not reasonable.  Section 7.7 of the Lease gives 1600 Penn "the right to establish reasonable rules and regulations governing the

---

preclude consideration of this testimony at this time.  See J.F. Feeser, Inc., 909 F.2d at 1542.

[7]CSC raises the doctrines of impracticability/impossibility or frustration, as well as the argument that it had terminated the Lease by letter dated November 16, 2006, and these arguments are rejected below.  CSC also claims that it had been evicted by 1600 Penn, that 1600 Penn had exercised its rights to "reenter" and "relet," and that 1600 Penn had retaken possession.

[8]Here, as it does through its brief, CSC also claims that 1600 Penn has not produced evidence of damages.  However, the Lease itself provides for damages upon default.  Thus, where we have not dismissed the possibility of default, we cannot dismiss 1600 Penn's claims for lack of damages.  In addition, 1600 Penn claims that CSC "materially breached" certain provisions of the Lease, and that any material breaches entitle 1600 Penn to collect damages quantified by the Lease.  "Whether the breach of contract is material is generally an issue of fact," Norfolk So. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008) (citing 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 1992)); Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. 1988), and this case does not fall outside the scope of this general rule.  Thus, for all claims that survive summary judgment, the issue of the materiality of the alleged breach will also survive summary judgment.

Leased Premises and the Common Areas, which, when communicated to Lessee in writing, shall become a part of this Lease."  1600 Penn's new rules required that CSC provide 1600 Penn with the following: (a) a site management plan, "including safety and security measures that are being implemented;" (b) two sets of keys to all facilities; (c) alarm access codes, along with the telephone numbers of the security firms who provided CSC's security alarms, as well as "Lessee account codes;" (d) alarm monitoring procedures and notification lists; (e) HVAC operational plans, including monitoring and temperature settings (heating temperatures were requested to be set at a minimum of 55 degrees Fahrenheit); (f) identification of the CSC parties responsible for daily management and oversight of the York Building, as well as the "representatives' locations and 24-hour access telephone numbers."[9]  CSC concedes that it did not comply with these requests.

As a general matter, reasonableness "is a question of fact to be decided by the jury and is dependent upon the numerous circumstances surrounding the transaction."  Yaros v. Trustees of University of Pennsylvania, 742 A.2d 1118, 1124 (Pa. Super. 1999) (citation omitted).  This Court cannot determine the "reasonableness" of the rules and regulations implemented by 1600 Penn because the parties dispute the material facts.  1600 Penn claims that this implementation was necessary due to ongoing concerns regarding the safety and security of the Leased Premises and common areas.  In addition, 1600 Penn claims that it only implemented the rules and

---

[9]While CSC claims that "certain" of the rules and regulations were not permitted under the terms of the Lease, this argument appears to be based on the idea that the rules and regulations would add terms to the lease.  However, Section 7.7 does not limit 1600 Penn's ability to implement new "reasonable" rules and regulations with reference to any provisions in the Lease or Addenda.  In addition, Section 7.7 actually contemplates the addition of new duties and terms to those specified in the Lease.

regulations after CSC ceased operations in the York Building and after CSC "expressed its intention to vacate without setting forth a plan to ensure the continued maintenance, safety, and security" of the York Building.  (Pl.'s Opposition at 16.)  CSC contends that 1600 Penn's concerns with safety were unfounded because "CSC maintained the ADT security system on the premises' doors, had an employee regularly checking the premises and had maintenance performed at the premises, as needed."  (Def.'s Motion at 17.)  CSC also cites the statement of a "security supervisor" that since CSC has vacated the premises, no security alarms have been caused by "security issues."  (Exhibit H to Def.'s Motion.)  However, a lack of incidents will not necessarily render CSC's preventative measures unreasonable.  Also, 1600 Penn cites Valerie Wolfe's deposition testimony for the fact that Wolfe visited the York Building only "when it was convenient," and cites Wolfe's calendar for the fact that she visited the York Building "no more than ten occasions between December 11, 2006 and March 11, 2007."  (Exhibit MM to Pl.'s Motion.)  Thus, the reasonableness of the implementation of the rules and regulations is not ripe for determination at this time, and the motions of both CSC and 1600 Penn are denied with regard to Count V of the Third Amended Complaint.

Count VI - Declaratory Judgment
CSC's Purported Early Termination of the Lease Agreements

We grant 1600 Penn's motion for summary judgment with regard to Count VI.  1600 Penn seeks a judgment declaring that CSC's purported termination of the Lease was invalid and ineffective.[10]  The procedure governing termination of the lease upon termination of the CDAC

---

[10]The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief.  Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Board, 298 F.3d 201, 210 n.12 (3d Cir. 2002).

Contract is set forth in Paragraph 3 of Addendum III, which amended Section 2.4 of the Lease:

> Only in the event that Lessee's contract with the CDAC, Contract Number GS-35F-4694G or any such subsequent related contract providing the same or similar products and services . . . shall be terminated for convenience, without cause by Lessee, Lessee shall have the right to terminate this Lease, provided that (I) such termination shall be effective on the date which is nine (9) months after Lessor's receipt of written notice thereof by Lessee, which notice shall be accompanied by written evidence of the termination of the CDAC Contract for convenience, provided such evidence is not deemed to be otherwise confidential information, and in such event, such other evidence of termination reasonably satisfactory to Lessor, (ii) and in no event shall such termination be effective prior to August 31, 2008, and (iii) accompanying the last month's rent, Lessee shall pay to Lessor, a termination fee . . . .

Further, the provision states that "[o]n the date of effective termination of the Lease, Lessee shall vacate the Leased Premises . . . ." 1600 Penn contends that CSC's termination of the Lease was invalid and ineffective because: (a) the CDAC Contract was not terminated for convenience; (b) CSC's notice of termination of the CDAC Contract did not include evidence that the CDAC Contract was terminated for convenience; and (c) CSC's Contract was terminated for cause.[11]

      A termination for convenience clause "provides a government escape clause." Cray Research, Inc. v. U.S., 41 Fed. Cl. 427, 438 (1998). Under such a clause, "the government may, under certain circumstances, terminate a contract and settle with the contractor." Torncello v. U.S., 681 F.2d 756, 764 (Ct. Cl. 1982). The government "may terminate a contract for its convenience only in the event of a change in the circumstances of the contract or in the parties'

---

[11]Because Count VI is resolved on the other issues, this Court does not reach the merits of 1600 Penn's contention that CSC's Contract was terminated for cause. However, we will observe that it is undisputed that CSC's CDAC Contract was not renewed because the Government made a determination that it was going to limit the award of the CDAC contract work to entities qualifying under Section 8(a) as small businesses.

expectations." Cray Research, Inc., 41 Fed. Cl. at 438. Here, 1600 Penn has produced evidence

that the CDAC Contract was not terminated for convenience. An email from a DHHS official

stated that the CDAC Contract "was not terminated for convenience"; rather, the "contract's

option period was not exercised and that does not constitute termination." (Exhibit LL to Pl.'s

Motion.)

CSC does not contest 1600 Penn's assertion that the termination was not for convenience,

and thus this fact is established.[12] CSC responds by arguing that it would be "unconscionable" to

enforce Paragraph 3 of Addendum III. Unconscionability is "'a defensive contractual remedy

which serves to relieve a party from an unfair contract or from an unfair portion of a contract.'"

Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (quoting Germantown Mfg.

Co. v. Rawlinson, 491 A.2d 138, 145 (Pa. Super. 1985)). "The party challenging a contract

provision as unconscionable generally bears the burden of proving unconscionability." Id.

(citing Bishop v. Washington, 480 A.2d 1088, 1094 (Pa. Super. 1984)). Although the inquiry is

often fact intensive, as long as the material facts are undisputed, "the determination of whether an

agreement is unconscionable is ultimately a question of law." Salley v. Option One Mortgage

Corp., 925 A.2d 115, 124 (Pa. 2007). Because courts recognize two categories of

unconscionability—procedural and substantive—an inquiry into unconscionability "requires a

two-fold determination: that the contractual terms are unreasonably favorable to the drafter and

that there is no meaningful choice on the part of the other party regarding the acceptance of the

---

[12]CSC does argue that its notice of termination was valid. However, Paragraph 3 of
Addendum III clearly requires evidence that the CDAC Contract was terminated for convenience.
Since CSC admits that the CDAC Contract was not terminated for convenience, it cannot be true
that CSC provided evidence that the Contract was terminated for convenience. Thus, CSC's
notice was invalid under the terms of Paragraph 3.

provisions." Id. at 181-82 (quoting Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1312 (3d Cir. 1994)).

While CSC notes that the phrase "termination for convenience" was a term "added by the lawyers to the 1994 Lease to which CSC was not a party," CSC makes no argument that it lacked a meaningful choice when it signed Addendum III, which included the same term.  Indeed, CSC admits in its Answer that it bargained for this provision in Addendum III.  In arguing that enforcement would be unconscionable, CSC does argue that allowing termination of the Lease only upon "termination for convenience" of the CDAC Contract would be substantively unfair. CSC juxtaposes two scenarios:

> [I]f the Government declared the CDAC contract ended under circumstances that it had to pay CSC its profit (terminated for convenience), CSC could get out of the Lease but if the Government did not renew the CDAC contract, thereby avoiding having to pay CSC any money, CSC could not get out of the Lease.

(Def.'s Motion at 22.)  According to CSC, this result "makes no sense and would be unconscionable."  (Id.)  CSC does not argue that the provision "unreasonably favors" 1600 Penn. Therefore, CSC's unconscionability argument must fail as a matter of law.  Thus, this Court enters summary judgment in favor of 1600 Penn on Count VI of the Third Amended Complaint declaring that CSC's purported termination of the Lease in the November 16, 2006 letter was invalid and ineffective.[13]

---

[13]While 1600 Penn alleges in the Third Amended Complaint that this invalid termination constituted a "material breach" of the Lease, 1600 Penn has not moved for summary judgment based on that claim.  Even if 1600 Penn had moved for summary judgment based on that claim, it is not at all clear as a matter of law that a material breach occurred given the facts that CSC had agreed that it would not surrender the leased premises until August 31, 2008 and made no claim that it would cease paying rent before that point.

Count VII - Tortious Interference
With CSC's Prospective Third Party Contract Benefits

We do not grant summary judgment in favor of CSC with regard to Count VII, and 1600 Penn has not moved for summary judgment on this count. In Count VII of the Third Amended Complaint, 1600 Penn claims that CSC tortiously interfered with 1600 Penn's potential contractual relationship with Buccaneer Data Services by refusing to assign or sublease the remaining term of the York Building to Buccaneer. The elements of a cause of action for intentional interference with a contractual relationship, whether existing or prospective, are as follows:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as the result of the defendant's conduct.

Blackwell v. Eskin, 916 A.2d 1123, 1127-27 (Pa. Super. 2007) (citing Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. 2003)). CSC appears to concede all elements of this claim other than the absence of privilege or justification on the part of the defendant.

The absence of privilege or justification is "closely related to the question of intent." Glenn v. Point Park Coll., 272 A.2d 895, 899 (Pa. 1971). Where, "as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest, which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. . . . What is or is not privileged conduct in a given situation is not susceptible of precise definition." Id. (internal quotations omitted). Generally, the central inquiry in the evaluation is whether the

24

interference is "sanctioned by the rules of the game which society has adopted [defining] socially acceptable conduct which the law regards as privileged."  Id.  Even when a party has a legally protected right to take an action, that action is privileged or justified only if done in good faith. Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 810 (3d Cir. 1994).

Neither party is entitled to judgment as a matter of law with regard to this issue.  As CSC points out and as 1600 Penn admits, CSC was not expressly required to agree to any assignment or sublease under the Lease and its addenda.  CSC has provided testimony stating that the decision not to assign the lease to Buccaneer was made so that "CSC would obtain additional revenue if, in fact, Buccaneer had to go and build-out their own facility.  We would get an extension of the contract and, therefore, have additional revenue."  (Exhibit to F Def.'s Motion.) However, 1600 Penn observes that an assignment or sublease of the Leased Premises to Buccaneer would have relieved CSC from any and all financial obligations under the Lease for the remainder of the Lease term.  In addition, the party to whom assignment or sublet was contemplated was the party that received the CDAC Contract work when CSC's contract was not renewed.  While CSC claims that it was never formally presented with a proposal to sublet or assign to Buccaneer, CSC admits that 1600 Penn contacted CSC with a "win-win" situation. Making all inferences in favor of 1600 Penn, a reasonable factfinder could infer from this limited record that CSC was not acting in good faith with regard to the proposed contractual relationship between 1600 Penn and Buccaneer.  We therefore do not grant summary judgment in favor of CSC.

<u>Counts VIII & IX- Breach of Contract</u>
<u>CSC's Failure to Pay Annual & Additional Rent</u>

      We do not grant summary judgment in favor of either party on Counts XIII and IX of the Third Amended Complaint.  1600 Penn claims that CSC materially breached the Lease by failing to pay rent.  CSC admits that it did not make the payments at issue, but claims in response that it was not required to make the payments for several reasons.  Because of the many disputed and unresolved issues related to 1600 Penn's claim as well as CSC's responses, this Court cannot dispose of Counts VIII and IX at this stage.

      CSC first argues that the doctrines of "impracticability/impossibility/frustration of purpose" relieve CSC of its obligations under the Lease.  We disagree.  For these doctrines to operate, CSC must show that "the parties predicated their agreement on the assumption that this situation would not arise," <u>Prusky v. Reliastar Life Ins. Co.</u>, 474 F. Supp. 2d 695, 699 (E.D. Pa. 2007), but the Lease at issue specifically contemplates an HCFA termination of the CDAC Contract during the term of the Lease.  In addition, the doctrines yield "to a contrary agreement by which a party may assume a greater as well as a lesser obligation," Restatement (Second) of Contracts § 261, and here Paragraph 3 of Addendum III specifically governs termination of the Lease upon termination of the CDAC Contract.

      Second, CSC argues that it was relieved of its duty to pay rent when 1600 Penn violated CSC's quiet enjoyment of the premises by changing the locks on the York Building.  Under Pennsylvania law, the covenant of quiet enjoyment is "implied in all leases."  <u>Kohl v. PNC Bank Nat'l Ass'n</u>, 912 A.2d 237, 248 (Pa. 2006).  In addition, Section 21.1 of the Lease provides that "Lessee, so long as it is not in default under this Lease, shall and may peaceably and quietly have,

hold and enjoy the Leased Premises for the Initial Term and Renewal Term, if any, without hindrance or disturbance by or from Lessor . . . ."  In the present case, we cannot grant summary judgment based on the covenant of quiet enjoyment preliminarily because we cannot determine whether CSC was in default under the Lease.[14]  In addition, the facts are not so one-sided that reasonable factfinders could find only in favor of one of the parties.

For example, while CSC can establish that 1600 Penn changed the locks on the York Building, 1600 Penn can establish that it contemporaneously gave a new set of keys to Valerie Wolfe, CSC's employee.  While CSC claims that 1600 Penn gave another tenant authority to change the locks so that the other tenant and 1600 Penn could access the leased premises, 1600 Penn has provided evidence that it had to change the locks so that it could "secure" doors left "unsecured" by CSC.  1600 Penn also produced evidence that it informed CSC that it would only access the leased premises in accordance with the terms of the Lease.  Under the present circumstances, where CSC had ceased operations at the York Building and may have defaulted on its obligations by failing to maintain and secure the premises, 1600 Penn may not have breached the covenant of quiet enjoyment by changing the locks on the York Building while still allowing CSC access to the Building.  Cf. Minnich v. Kauffman, 108 A. 597 (Pa. 1919) (covenant breached where landlord locked up leased premises and denied tenant access).

Third, CSC contends that it was relieved of its duty to pay rent because it tendered possession of the premises back to 1600 Penn.  "Before an act of surrender by a tenant can be held to relieve the tenant from further liability under a lease, the landlord must accept the

---

[14]While we have declared that CSC's purported termination was invalid, it is not clear that an invalid termination placed CSC in default under the Lease where, as here, CSC appears to have agreed to continue paying rent until surrender on August 31, 2008.

surrender." Stonehedge Square Ltd. P'ship v. Movie Merchs., Inc., 685 A.2d 1019, 1023 (Pa.

Super. 1996).  Whether a landlord accepts a tenant's surrender requires a determination of the

landlord's intent, "and, as such, it is ultimately a question of fact for the jury." Onal v. BP

Amoco Corp., 275 F. Supp. 2d 650, 669 (E.D. Pa. 2003); see also Hirsh v. Carbon Lehigh

Intermediate Unit #21, 65 Pa. D. & C. 4th 390, 413 (Pa. Com. Pl. 2003).  The burden is on the

tenant to show the landlord accepted surrender "by clear and convincing evidence." Stonehedge

Square Ltd., 685 A.2d at 1023; Onal, 275 F. Supp. 2d at 669.

     Here, 1600 Penn explicitly rejected CSC's purported tender.  But CSC contends that 1600

Penn's conduct is nevertheless consistent with having evicted CSC and assumed possession of

the premises.  CSC points to the facts that 1600 Penn entered into a contract with ADT for the

premises, obtained a quotation to demolish various walls in the premises, and allowed another

tenant to access CSC's area to turn off the burglar alarm during business hours.  CSC also draws

our attention to the fact that 1600 Penn has had discussions with various other potential tenants.

However, in order to succeed under Pennsylvania law CSC cannot merely produce evidence that

1600 Penn resumed possession of the leased premises.  Rather, CSC must produce evidence

"'that such resumption of possession is not merely for the protection of the property during the

absence of the tenant, but is adverse to a reoccupation of it by him.'" Stonehedge Square Ltd.,

685 A.2d at 1023 (quoting Kahn v. Bancamerica-Blair Corp., 193 A. 905, 907 (Pa. 1937)).  CSC

has not yet produced such evidence.

     CSC also raises the argument that 1600 Penn cannot claim damages in the form of annual

and additional rent due because 1600 Penn has terminated the Lease and retaken possession of

the premises from CSC.  It is true that under Pennsylvania law "'upon breach of a material

condition in a commercial lease a landlord must elect repossession and actual damages or

acceleration of the balance due.'" Onal, 275 F. Supp. 2d at 668 (quoting Finkle v. Golf W. Mfg.

Co., 744 F.2d 1015, 1021 (3d Cir. 1984)).  This rule prevents a landlord from reaping the double

recovery "that would result from a rule allowing a landlord to possess the property, and possibly

reap a profit from renting or selling it, at the same time that he collects rent from a breaching

tenant." Id.  However, if a landlord remains out of possession and the lease contains an

acceleration clause, the landlord "may receive [as] a lump sum all rents that will fall due during

the unexpired term of his lease." Id. (citing Pierce v. Hoffstot, 236 A.2d 828, 830 (Pa. Super.

1967)).  The Lease at issue in this case does contain an acceleration clause.  (See Lease

Agreement § 17.2.4.)  Unlike the prevailing parties in the decisions cited by CSC, CSC has not

presented evidence that 1600 Penn has obtained a judgment for possession.  Compare Homart

Development Co. v. Sgrenci, 662 A.2d 1092, 1100 (Pa. Super. 1995) (where landlord had

obtained entry of judgment for possession, landlord could not also obtain judgment for rental

payments due under acceleration clause); Delong Hook & Eye Co. v. Tait, 164 A. 848, 849 (Pa.

Super. 1933) (same); Greco v. Woodlawn Furniture Co., 99 Pa. Super. 290 (1930) (same).  In

addition, as discussed above with regard to surrender, CSC has not produced evidence that would

allow this Court to rule that, as a matter of law, 1600 Penn has in fact taken possession of the

leased premises.  CSC merely points to 1600 Penn's Memorandum of Law in which 1600 Penn

asserts that it has availed itself of the remedies provided under the Lease including the right to

relet, the right to terminate, and the right to accelerate.  However, in the cited language, 1600

Penn appears to be merely referring to the confession of judgment it sought for rental payments

due under the acceleration clause.  When it accuses 1600 Penn of failure to mitigate damages,

CSC itself admits that 1600 Penn has not in fact relet the premises.  Therefore, CSC's argument cannot succeed at this stage.

Finally, CSC claims that 1600 Penn's claims must fail because 1600 Penn failed to mitigate the damages by reletting CSC's space in the York Building to another tenant of the York Building.  However, "Pennsylvania law imposes on a landlord no duty to mitigate his damages." Onal, 275 F. Supp. 2d at 670 (citing Stonehedge Square Ltd. P'ship v. Movie Merchs., Inc., 715 A.2d 1082, 1084 (Pa. 1998)).  This rule relieves a nonbreaching landlord of a duty "to seek a replacement tenant whose rental payments would apply as a credit or a set-off toward the obligation of the breaching tenant under the lease." Id.  Because there is a genuine issue of material fact with regard to whether 1600 Penn breached the covenant of quiet enjoyment, CSC cannot prevail on its failure to mitigate claim.

Count X - Breach of Contract
Failure to Adequately Surrender Possession of the Leased Premises

We will not grant summary judgment in favor of either party with regard to Count X of the Third Amended Complaint.  1600 Penn claims that CSC breached Section 18.1 of the Lease by failing to return the York Building in the condition called for in Section 18.1.  Section 18.1 provides, in relevant part, that "[u]pon the expiration of the Initial Term of Renewal Term, if any, or any earlier termination thereof . . . Lessee shall peaceably surrender to Lessor possession of the Leased Premises and all improvements constructed and installed thereon in good condition and repair, normal wear and tear excepted . . . ."  Section 18.1 also provides that "if Lessee shall not then be in default under any of the covenants and conditions hereof, Lessee shall . . . remove or cause to be removed all nonpermanent furniture, furnishings, fixtures and equipment and all

30

trade fixtures placed by Lessee on or in the Leased Premises."  As briefed by the parties, the dispute revolves around the fact that CSC left cubicle walls in place at the York Building.  1600 Penn had the walls "demoed" at a cost of $25,792.00.

        The parties have not put forth evidence that would allow this Court to decide this claim as a matter of law.  First, we have conflicting evidence as to which party owned the walls or "placed" them on the premises.  On the one hand, 1600 Penn paid to have the walls "demoed" when CSC ceased operations at the York Building.  On the other hand, CSC has drawn our attention to evidence that 1600 Penn installed "steel stud and drywall partitions."  (Exhibit K to Addendum III.)  Second, we do not know enough about the walls themselves to determine whether they were "improvements constructed and installed" on the premises or "nonpermanent furniture, furnishings, fixtures and equipment."  The parties have informed us only that the walls were "cubicle walls."  We have received no other description.  We do not know how they were constructed or what specific work was needed to remove them.  Third, as discussed above, we have not determined whether CSC was in default of various provisions as well as any rules and regulations.  Thus, we do not grant either party's motion for summary judgment.

<u>Counterclaim I - Declaratory Judgment</u>

        CSC's motion for summary judgment with regard to its counterclaim for declaratory judgment is denied.  CSC has requested a declaration that (1) its termination of the Lease was valid, (2) it is not in default or material default of the Lease, (3) 1600 Penn's demands for access are improper, (4) 1600 Penn has materially defaulted under the Lease, and (5) CSC is excused from performing further under the Lease.  In the alternative, CSC has sought a declaration that it is entitled to a declaration that the Lease terms are impossible to perform and/or impracticable.

31

For the reasons set forth above, CSC's requests are denied.

IV.     CONCLUSION

Accordingly, CSC's motion for summary judgment is denied in part and granted in part, and 1600 Penn's motion for summary judgment is denied in part and granted in part.   An appropriate order follows.